Chief Justice Bibb,
differing from the majority of Ihé Court, delivered Ids own opinion.
As I do not concur in the judgments, in these two cases, directed by a majority of the court, nor with many of the arguments employed in coming to that conclusion, duty requires of me to state the judgments whicii 1 think ought to be rendered. In doing so, I shall not attempt the unpleasant task of arguing against the opinion of the court as formed; but shall content myself with giving as briefly as I can, my own opinion) and the reasons upon which it has been formed, leaving the points of concurrence and disagreement to be inferred from the opposite conclusions which shall appear.
That the judges should not by construction, give to a statute a retroactive effect and operation, where the words of the enactment admit of construction, and where the principles of public justice, equity *143 and sound policy do not demand it, I readily agree. That all retrospective laws are to be condemned as unjust, is a proposition too broad for my assent. That every retrospective law enacted, however positively, although not falling under the description of ex post fado larvs, or laws impairing the. obligation of contracts, is to be carried into effect, by the judiciary, is likewise a proposition too general to have my qssent. Whether a law prospective, as well as retroactive in effect, by plain intent of the legislature, shall, or shall not be enforced in relation to previous events, must depend upon the subject matter. The power of passing retrospective laws is necessary to the well being of society and the body politic. Whether that power has been used discreetly, or abused and perverted to the destruction, (if indulged) of fundamental and immutable principles too hallowed and consecrated to be touched by the legislature, may, in spine cases he doubted, and not clearly to be discerned, In such cases an overgrown jealousy and tremulous apprehension of the democratic tendencies of the government will draw the conclusion one way; whilst a bold and generous confidence in' the recuperative faculties and moral tendencies of the government will draw a different conclusion. Between the cheerful rays of the sun, and the murky darkness of the night, the difference is striking and palpable. But there are spaces between the setting and the rising sun, between the coming of the night, and the coming of -the morning, which cannot be certainly assigned to the dominion of the day, or to the dominion of the night. About these we may disagree; but no philosopher would consign both twilights to the kingdom of night, or wish them expunged from the system as useless and dangerous. Between the going down of the lights of the legislative department, and the rising of the mild reflected lights of the judicial department; between the setting of the powers of the judicial department, and the rising of the powers of the legislature, there are twilights in political government, as in the natural government of the world. These twilights can no more be expunged from the order of political government, than *144 from the order of the material world. As the sun is made to rule and govern the day, and the moon to rule and govern the night, so. the legislature is created to declare the law, and the judiciary to administer the law. As the moon fills her horns from the rays of tne sun, so the judicial department of the government must fill her horns from the clear and genial rays and powers of the law- Contend as we may, about the separation and division between the powers of the legislative and the judicial depart* mcnts, there are twilights and spaces, in which the lines of separation and division cannot be clearly seen nor distinctly told. The judicial department, must not, and cannot properly claim all the twilights, the whole space between the visible horizon and the real as belonging exclusively to her domin* ion. I hold him the wisest legislator, or judge, who endeavors, as far as well he can, so to act, as not to provoke a contest fpr the exclusive dominion over tliis territory of doubtful property and conflicting jurisdictions.
I have, written without intention to cast censure on any individuals or individual, in times past or present; for the truth of this I appeal to the searcher of all hearts. The subject involved is of difficulty in the abstract. My own experience has taught me that the subject of retrospective laws, permissible, and prohibited by the principles of eternal and immutable justice, includes a class of difficult propositions, hard to abstract and demonstrate, and not de* finable by any rule which will resemble a mathematical line without breadth. Define and reason as we may, upon this subject of the boundary between legislative and judicial powers, all our lines of demarkation will have breadth, like the great circles of the zodiac and the zones, the equator and the degrees of latitude. Being so undefined and undefinable, they, as points of faith, of doubtful and disputed orthodoxy, apt to beget an overheated zeal, from, the very fact, that they are reducible to no certain standard of truth, demonstrable to every capacity., and are therefore prone to degenerate into intermina* ble controversies'and divisions, like the warfares of a race of Indians who differed and fought about th§ *145 virtues of a monkey’s tooth, or those of the Mahometans about the mode of ablution, and those diiferences of sectarians in the purest of all religions, about the truth of their peculiar and distinguishing sectarian doctrines. Mutual toleration and forbear;anee with a just- degree of mutual confidence between the legislature and judiciary upon these difficult and obscure questions of the division of power; a cautious abstinence on the part of the judiciary, from provoking unnecessarily a discussion of these questions, so as not to irritate public sentiment, to react, and bestow distrust where confidence is so essential; to avoid the exercise of doubtful powers, and to use those which are clear and unquestionable, are (in my judgment) the safest rules to go by, and tend most to the establishment of social order, good government,' prosperity and happiness. I expect in these days, more of censure than of commendation for what I have advanced; but posterity may better understand and appreciate the principles and truths which I have alluded to, without aiming at any distinctive limitations of which they are susceptible in my own mind.
The circuit court has rendered judgment in this case under the act of t.lie 20th December, 1820, concerning occupying claimants of land who shall be evicted, when, at the’ rendition of the' judgment, that act had been repealed by the act of the 7th January,’ 1824, (Sess. acts, 450. sec. 16,) and after the provisions of the act of 1812 had been revived and declared to be in full force.
The repeal of the act of Dec. 1820, by that of January, 1824, is clear, unambiguous, and without any qualification or reservation whatever. I see no room for doubt or construction as to total and unreserved repeal. The meaning of the legislature in the repealing act, as to an unqualified repeal of the act of 1820, is to my mind so full, clear and explicit, as hot to admit of a doubt; there is no room for construction. The repealing act, does not in itself, or in terms, leave any power or discretion in the courts to ’render any judgment after the repeal, under the act so repealed.
*146 If the judgment rendered in this. cage, after this repeal, and rendered according to tlie act so previously repealed, can be sustained, it seems to me, it must be in defiance of the authority of the act of the legislature, and of its plain and explicit meaning. The repealing act, after a full and unqualified repeal of the act of 1820, does not stop there, it revives the provisions of the act of the 31st of Jan. 1812, entitled “ an act concerning occupying claimants of lands,” which were repealed by the act of 1820, and that the said provisions of the act of Í812, “ bp, and the same are hereby declared to be in full furce.” By the act of 1812, the occupant is charged with rents from the judgment or decree; by the act of 1820, he is discharged from rents, and permitted to hold the land free of rent, until the successful claimant shall pay to the occupant the value of the improvements, after deducting waste and damage after suit. Bytlip act of 1812, the land was to be valued as woodland, and if the improvements exceeded three fourths of the value of the ■ land,_ as if the improvements had not been made, the successful claimant had his election to yield the land and take the value; by the act of 1820, this election is taken away. By the act of 1812, the successful claimant, had liberty to give bond with approved security, to pay for thg improvements in two equal annual instalments; by the act of 1820, that indulgence is taken away; and the occupant retained in possession rent free, and the successful claimant debarred of his property until he pays the yalue of the improvements. By the act of 1S12, the occupant was to have a connected title in law or jn .equity, under a conflicting grant from the Commonwealth regularly deduced; by the act of 1.820, this provision is abolished, and the act applied to every bona fide occupant, whether he could deduce a title in law .or equity or not, and whether lie settled and held under a conflicting adversary claim, or under the same claim. By the act of Í820, the court was to render judgment in favor of the occupant for the value of the improvements, after deduction of waste and damage after suit; and if the successful claimant, did not pay in five years, (the occiw pant still retaining it rent free) the successful claim- *147 'tot, was at liberty to improve, and those improvements to be charged upon the successful claimant and paid for before he could get possession.
No one is more thoroughly convinced than I am, of the sound policy and propriety of protecting the agricultural industry and labor- of the country, and of the necessity of guarding the improver, who has Seated lands under a grant from the Commonwealth, from the effects of the ill digested system for granting the vacant lands, adopted by Virginia, out of rVhich subh confusion and multiplied conflicting claims to the same land had arisen, that it was impracticable to ascertain, but by the judgment of the court, which claim was the better.. The act of 1812 was founded in justice and equity; demanded imperiously by the circumstances and situation of the country, and the confusion of claims to land; its policy was sound, anti the industry and prosperity of the country intimately connected with it; its provisions were understood, it applied exclusively to that description of adverse conflicting surveys and grants sued out from the Commonwealth, (and tono others) which were the peculiar and calamitous embarrassments in ascertining the titles to the soil.
But it cannot be denied that the act of 1820 had, by repealing the great principles and characteristics of the act of 1812, as -well as abolishing the rule of election between the successful claimant and occupant, and by abolishing all claim for rents after judgment, and retaining the occupant in possession without accountability, - introduced a system very different in principle, in policy, in justice and in equity, from the act of 1812. it had introduced features so harsh, rigorous and unequal, so favorable to the occupant, and so unfavorable to the successful claimant, as to come within the class of disputed powers of legislation, and endangered the whole system of equity and policy, even of the act of 1812. The legislature, believing that the act of 1820 had pushed the claims of the occupant too far, and with too little regard to those considerations which were due to the right owner of the soil, repealed that act, ami restored the old law, and with *148 it a system more just, more equitable, inore impartial and mofe safe. Why shall the judiciary interfere to prevent this ? 'if- hen the legislature had travelled ho far that twilight had surrounded them; when it was doubtful whether they had not travel-led even beyond the limits of legislation; and have ’ receded and repealed an act sb harsh in its provisions, and so doubtful as to the power, why shall the judiciary refuse to pbrmit it? Mhst we straifi at it gnat, and swallow a cdrnel r
Í have no difficulty on the point about the repeal of the act of 1820; it was gone, totally gone, and repealed before this j udgment was rendered under and according to its harsh and rigorous provisions; totally disregarding tire equitable provisions of the ■act of 1812, which had been revived. The remedy and judgment was statutory, depending on the statute of .1820, when that statute was repealed unconditionally. The judgment (in my view of the question) .is unlawful, unauthorized, and contrary to the law then in full force. The right and the remedy, under the act of 1820, are intimately and. inseparably connected and dependent, and both statutory, both hanging by the statute, and depending on its continuance, so that I cannot see how this judgment on that statute after it was repealed can stand. The base of Payne vs. Conner, 3 Bibb, 181, is conclusive upon this point; it acknowledges this principle, in these tvdrds: “ it is dear that where a statute giving a remedy uukrioWn to ihe common law is repealed, the power of tlie courts td give réíiéf under the statute necessarily ceases.”
The case of Bull and wife vs. Calder, 3 Dallas, 386, by the unanimous opinion of the supreme court, decides the point, that a legislature may pass certain classes of retrospective laws, and that retrospective-law, which provided for, and allowed a new trial to be granted after all power of the courts over the trial had, was at an end, and liad ceased, was carried into effect. That decision affirms the power of the legislatures of the several states, to enact certain kinds of retrospective laws. The decision clearly affirms tills principle, that there are coses in which laws may justly, and for the benefit of the comirni *149 uity, ánd also Of individuals, relate to a time antecedent to their commencement; judge Chase is clear and explicit on that point (in pages 391 and 393.) -Judge Iredell is equally explicit, and declares that if “ the legislature of the Union, or the legislature of any member of the Union, shall pass a law, within the general scope of their constitutional power, the court cannot pronounce it to be void, merely because it is in their judgment contrary to the' principles of natural justice. The ideas of natural justice are regulated by no fixed standard; the ablest and purest men have differed upon the subject; and ail that the court could properly say, in such an event, would be that the legislature (possessed of an equal right of opinion) had passed an act, which in the .opinion of the judges was inconsistent with the abstract principles of natural justice.” Again, he is equally explicit in declaring “ without the posses-session of this power,” (alluding to the power to pass certain retrospective laws,) “ the operations of government would often be obstructed; and society itself would be endangered. It is not sufficient to urge, that the power may be abused, for such is the nature, of all power.” Judge Chase declared, “ if the term fea; post facto law is to be construed to include and prohibit the enacting any law after a fact, it will greatly restrict the power of the federal and state legislatures'; and the consequences of such a construction may not be foreseen.” By the whole court consisting of four justices of the supreme cotirt, the law of Connecticut, made after the fact, and tq operate upon the fact, was sustained and declared valid..
In the case of the Aurora vs. the United States, (7 Cran. 382) the supreme court of the United States did give effect to an act of the Congress of the United States, which had expired, and which was revived, and revived with a retroactive effect; and by the act of 2d March, 1818, in reviving and. declaring an expired act should be in force, the court applied it to a fact of the second of February preceding the revival, and under that retroactive effect the cargo of the vessel was adjudged to the libellants, and against the claimant}
Wicklifje and Crittenden, for plaintiff; Combs, for' defendant.
The Icgisture had the same right to repeal the law of ¡830, that they liad to enact it; they did repeal it; the case in question, is not one arising out of contract; nor is it an ex post facto law within the meaning and definition of Such laws; the legislature did repeal it, and by that repeal introduced a rule much more equitable and consistent with justice than that given by the act of 1820.
Therefore, my opinion is, that the judgments should be reversed, the report of. the commissioners quashed, and the causes remanded, with directions to proceed under the Occupying claimant law of 1812, as rc'vived and continued in force by the act of 1824.